**Charles BARLOW, Next Friend of Danny Iblings, a Minor, Appellee,**

v.

**Glenn IBLINGS, Appellant.**

**No. 52664.**

Supreme Court of Iowa.

Feb. 6, 1968.

Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for appellant.

L. E. Linnan, Algona, and Hamilton & Connell, Storm Lake, for appellee.

LARSON, Justice.

This appeal presents but one question—can an unemancipated minor child maintain a cause of action against his father for personal injuries proximately caused by the father's ordinary negligence? This action involves only a parent and child relationship and does not involve any willful or malicious conduct. There is little or no dispute as to the relevant facts.

From the pleadings it appears that Glenn Iblings, the defendant, operated a cafe in Algona, Iowa. In the kitchen of the cafe was an electric meat grinder which could be activated by a switch so located on the grinder that a child of six years could reach it.

In this action for damages brought by his next friend, defendant's son Danny Iblings, six years of age, alleged that he was in the cafe kitchen with his father, as he had been on previous occasions, that although the father knew he was in the

kitchen and knew of his interest and curiosity about the grinder, he was left alone in that area, and that when he turned on the meat grinder and inserted his hand therein, he lost all of the fingers and a portion of one hand. In Count I the child alleged his father's negligence was the proximate cause of these injuries, and in Count II alleged insurance coverage of the hazard.

The trial court sustained defendant's motion to dismiss Count II relating to insurance and overruled his motion to dismiss based upon a failure "to state a claim upon which any relief" could be granted in Iowa. On application defendant was granted permission to take this interlocutory appeal. Plaintiff did not appeal the ruling on Count II.

I. Although the question as to whether an unemancipated child can maintain an action against his parent to recover damages for negligence has been presented to this court previously, we have not given it serious consideration in the past nor have we found it necessary to rule thereon. In Cody v. J. A. Dodds & Sons, 252 Iowa 1394, 1396, 110 N.W.2d 255, disposed of on other grounds, we said: "While there is respectable and substantial authority in other jurisdictions sustaining (defendant's position) * * * we do not find that the question has been determined in Iowa." Also see 47 Iowa L.Rev. 1159 (1962).

In 39 Am.Jur., Parent and Child, § 90, it is stated: "Although there is nothing in the English decisions to suggest that under the early common law a child could not sue its parent for a personal tort, it has become established by the weight of authority in this country that no such action can be maintained by the child." Also see Dunlap v. Dunlap, 84 N.H. 352, 150 A. 905, 71 A.L.R. 1055, and 43 Harv.L.Rev. 1058, for extended discussions. Our own research of the question leads us to conclude that the English decisions are of no aid. We find no decision, dictum, or textwriting that mentioned the subject as late as the 18th century. It would be pure speculation and conjecture to state categorically that a child could sue to enforce personal rights under the common law. See annotation, 19 A.L.R.2d 423. All that can be gleaned from the early common law is that there were parental rights and duties which may have been superior to the independent personal rights and duties of the child. Although the unique relationship of parent and child was recognized, the only early development in this area was that of property rights. Dunlap v. Dunlap, supra, and citations. It is abundantly clear, however, that the doctrine of parental or family immunity in tort matters originated as a court-made doctrine and did not arise from code edicts or as a result of legislative enactments.

II. The doctrine of parental immunity had its beginning in the United States in the landmark case of Hewellette v. George, 68 Miss. 703, 711, 9 So. 885, 13 L.R.A. 682 (1891). In that case an unemancipated minor daughter sued her mother for damages resulting from the alleged willful, illegal, and malicious imprisonment of the daughter in an insane asylum. It was the mother's claim that this restraint was necessary to protect the daughter and the family from the daughter's loose and unchaste habits. In reversing the judgment for the child, the court said in part: "So long as the parent is under obligation to care for, guide and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. * * * The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand." This decision was followed in 1903 by McKelvey v. McKelvey, 111 Tenn. 388, 77 S.W. 664, 64 L.R.A. 991, and later by Roller v. Roller, 37 Wash. 242, 79 P. 788, 68 L.R.A. 893, 107 Am.St. Rep. 805. All of these were extreme cases and the rule propounded therein has been modified by recent cases. Borst v. Borst, 41 Wash.2d 642, 251 P.2d 149.

At least seven reasons have been advanced in the opinions from various jurisdictions in support of the proposition that an unemancipated minor may not sue his parent for personal injuries arising from the parent's ordinary negligence. Briefly, they are: (1) danger of fraud, (2) possibility of succession, (3) family exchequer, (4) analogy to denial of a cause of action between husband and wife, (5) domestic tranquillity, (6) domestic government, and (7) parental discipline and control. 5 Vill.L.Rev. 521, 529; 43 Harv.L.Rev. 1030, 1072–1077; 36 Iowa L.Rev. 384. Those efforts to justify the doctrine's underlying public policy have resulted in considerable criticism by text and editorial writers and some judges, some with merit and some without. See Harper & James, The Law of Torts, §§ 8.11, 13.4 (1956); Prosser, Law of Torts, § 101 (2d ed. 1955); McCurdy, "Torts between Persons in Domestic Relation," 43 Harv.L.Rev. 1030 (1930); Seavey, "Torts,", 1958 Annual Survey of American Law, p. 487; 26 Tenn.L.Rev. 561 (1959); 58 Colum.L.Rev. 576 (1958); 19 U.Pitt.L.Rev. 681 (1958); 38 Cornell L.Q. 462 (1953); 10 Wash. & Lee L.Rev. 121 (1953); 39 Va.L.Rev. 389 (1953); 7 Wyo.L.J. 199 (1953); 2 De Paul L.Rev. 119 (1952); 64 Harv.L.Rev. 1208 (1951); 4 Vand.L.Rev. 377 (1951); 7 Fordham L.Rev. 459 (1938); 79 U.Pa.L.Rev. 80 (1930); cf. 28 U.Cinc.L.Rev. 540 (1959); 33 St. John's L.Rev. 310 (1959); 31 Temp.L.Q. 233 (1958); 3 Vill.L.Rev. 577 (1958); 9 Syracuse L.Rev. 346 (1958); 55 Mich.L. Rev. 463 (1957); 30 So.Cal.L.Rev. 368 (1957); 34 Chi.Kent L.Rev. 333 (1956); 51 Nw.U.L.Rev. 610 (1956); 35 B.U.L.Rev. 205 (1955); 7 Okla.L.Rev. 238 (1954); 2 Buffalo L.Rev. 166 (1952); 5 S.C.L.Q. 294 (1952); 5 Ala.L.Rev. 173 (1952); 6 U.Miami L.Q. 617 (1952); 1 Catholic U.L. Rev. 161 (1951); 26 Ind.L.J. 465 (1951); 22 Miss.L.J. 174 (1951); 23 Rocky Mt.L.Rev. 225 (1951); 30 Ore.L.Rev. 86 (1950); 32 Marq.L.Rev. 289 (1948); 28 Geo.L.J. 430 (1939); 86 U.Pa.L.Rev. 909 (1938); 14 Tenn.L.Rev. 294 (1936); 11 N.C.L.Rev.

352 (1933); 33 Colum.L.Rev. 360 (1933); 20 Calif.L.Rev. 342 (1932); 7 Notre Dame Law. 259 (1932); 16 Cornell L.Q. 386 (1931); 15 Minn.L.Rev. 126 (1930); 16 Catholic Univ.L.Rev. 484; 12 So.Dak.L. Rev. 364. These criticisms are largely predicated upon the alleged unfairness and discrimination against an individual because he is an unemanicpated minor in the family unit. The right of the minor to collect damages for every breach of his parents' legal duty, they contend, is sufficient to overcome the evil which could result by such actions between parent and child. See Hastings v. Hastings, 33 N.J. 247, 163 A.2d 147, 149. We are unable to agree with that conclusion.

Appellee concedes the public policy upon which this doctrine was first announced was sound, but contends, due to many changes in our social and economic life today, the doctrine of parental immunity is obsolete and should be renounced by the courts. For that view, he cites and relies upon the cases of Signs v. Signs, 156 Ohio St. 566, 103 N.E.2d 743; Borst v. Borst, supra; Wright v. Wright, 229 N.C. 503, 50 S.E.2d 540; Lusk v. Lusk, 113 W. Va. 17, 166 S.E. 538; Balts v. Balts, 273 Minn. 419, 142 N.W.2d 66; Briere v. Briere (N.H.), 224 A.2d 588; Ertl v. Ertl, 30 Wis.2d 372, 141 N.W.2d 208, and citations; Chase v. New Haven Waste Material Corp., 111 Conn. 377, 150 A. 107, 68 A.L.R. 1497; Maine v. James Maine & Sons Co., 198 Iowa 1278, 201 N.W. 20, 37 A.L.R. 161. He urges us to adopt the position of numerous text and law review articles and the New Hampshire, Wisconsin, and Minnesota opinions applying them.

We cannot concede that the sound public policy upon which this doctrine was predicated has changed, that it should be changed, or that we should lend our aid to its rejection or dissipation in Iowa. It is our feeling that the basic reasons for the doctrine have remained the same over the years. Domestic tranquillity, proper parental discipline and control, family unity,

and social responsibility, *are* ample grounds to sustain the policy and the doctrine. Nahas v. Noble, 77 N.M. 139, 420 P.2d 127, and citations. Other reasons advanced are invariably premised upon the promulgation and promotion of the family as a unit and a steadfast belief that such actions would upset and tend to destroy this vital relationship. Most of the confusion as to this doctrine, we think, has developed as a result of some courts' efforts to expand exceptions to it without a sound or substantial basis therefor. Only one of these needs consideration in this case, and it will be considered in a later division.

III. It will be remembered that here we are dealing with a situation where the parents and child are living together under harmonious conditions and the charge is one of simple negligence against the father. Nothing in the record discloses or implies intentional or even thoughtless disregard of intrafamilial responsibilities and duties. These responsibilities fundamentally do not rest on any hard-set rule of law or statute, but derive mainly from the mutual love and affection that exists in the home. In terms of a legal duty, defendant's negligence here amounts to no more than a minute breach of duty. To attach thereto the financial liability due a stranger, we think, involves even greater inequities and devastating consequences to family life. Hastings v. Hastings, supra, 33 N.J. 247, 163 A.2d 147, 149 (1966). In Hastings it is stated: "The question is not one of the absence of a duty of reasonable care owed by the father to his child, but rather of immunity from suit thereon. Matters of immunity must be determined, in the absence of specific legislation, on the basis of policy or, perhaps more accurately, on the weighing of competing policies." Obviously, then, the developed public policy upon which the family immunity doctrine is based is the proper balance of these legally-recognized duties and responsibilities within the family.

In Nahas v. Noble, supra, 77 N.M. 139, 420 P.2d 127, 128 (1966), the court said:

"Encouragement of family unity and the maintenance of family discipline being sound public policy, we hold that a parent cannot maintain an action in negligence against an unemanicapted minor child." Similarly, in Pullen v. Novak, 169 Neb. 211, 99 N.W.2d 16, 25, the court stated: "We find that generally an unemancipated minor cannot maintain an action against his parents, * * * to recover damages for ordinary negligence." In 31 Tex.Jur., § 6, page 1281, it is stated: "The relationship of parent and child precludes the maintenance of an action by the child against the parent for a personal tort. This rule is founded upon a sound public policy—upon the interest that society has in preserving harmony in the domestic relations. * * *"

The leading case and the one most often cited on this issue is Hewellette v. George, supra, 68 Miss. 703, 9 So. 885, 887, 13 L.R.A. 682, where it is stated: "The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffererd at the hands of the parent." Similarly, in the early North Carolina case of Small v. Morrison, 185 N.C. 577, 118 S.E. 12, 13, 31 A.L.R. 1135, cited with approval in Aboussie v. Aboussie, Tex. Civ.App., 270 S.W.2d 636, 639, it is said: " * * * From the very beginning the family in its integrity has been the foundation of American institutions, and we are not now disposed to depart from this basic principle. * * * Hence, in a democracy or a polity like ours, the government of a well-ordered home is one of the surest bulwarks against the forces that make for social disorder and civic decay * * *" Aboussie went on to hold: "We believe that the peace and tranquility of the home and the best interest of minor children will be subserved by following the general rule that an unemancipated minor child cannot sue its parent for damages based on acts of ordinary negligence."

The case of Trudell v. Leatherby, 212 Cal. 678, 300 P. 7, 8, established the law on this question in California. The case dealt with a tort action by a child against its parent for simple negligence. In holding that the child could not maintain the suit, the Supreme Court of California gave the same reasons as those first announced in Hewellette v. George, supra. This pronouncement was also cited with approval in Perkins v. Robertson, 140 Cal.App.2d 536, 295 P.2d 972.

In Cowgill v. Boock, 189 Or. 282, 305, 218 P.2d 445, 455, 19 A.L.R.2d 405, Justice Rossman in a concurring opinion appropriately stated: "Immunity is accorded the parent, not because he is a parent, but because, as a parent, he pursues a course within his household which society exacts of him and which is beneficial to the state. Society expects parents to keep the home in order, to preserve within it domestic tranquillity, to see to it that the children go to school and that they deport themselves properly in the neighborhood. The parental non-liability is not granted as a reward, but as a means of enabling the parents to discharge the duties which society exacts."

Finally, in Cannon v. Cannon, 287 N.Y. 425, 40 N.E.2d 236, the court stated of the parents' duties and responsibilities: "As to the parents—the law which imposes upon them the duty to support and discipline a minor child, and to prescribe a course of conduct designed to promote his health, education and recreation, accords to the parents a wide discretion. * * * Indeed, if within the wide scope of daily experiences common to the upbringing of a child a parent may be subjected to a suit for damages for each failure to exercise care commensurate with the risk—for each injury caused by inattention, unwise choice or even selfishness—a new and heavy burden will be added to parenthood." The court declined to implement such a burden.

The views presented above are by no means exclusive, but are presented to establish a brief cross section of judicial pronouncements in this area. We do not hesitate to add that we are in accord and wholly endorse these views as solid fundamental policy and reasoning supporting the basic foundations of family life. We believe that the family unit, which is basic to all cultures and societies, and vitally important to ours, should not include in its internal structure a concept of recompensable fault in cases of ordinary negligence involving the family relationship. Moreover, we are satisfied that the arguments advanced for the rejection of the family immunity doctrine are fundamentally unsound, are utterly and completely repugnant and foreign to a harmonious family relationship, and feel they erroneously attempt to equate all human behavior in mere monetary values.

IV. Our research has revealed only one state which appears to have completely abrogated the family immunity doctrine. See Gaudreau v. Gaudreau, 106 N.H. 551, 215 A.2d 695, cited with approval in Briere v. Briere (N.H.), supra, 224 A.2d 588 (1966). Other cases, including Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193, cited with approval in Ertl v. Ertl, supra, 30 Wis. 2d 372, 141 N.W.2d 208, and Balts v. Balts, supra, 273 Minn. 419, 142 N.W.2d 66 (1966), have merely carved out new exceptions to the doctrine. On the other hand, we find at least three State Supreme Courts recently have refused to follow their lead in restricting or abrogating the doctrine. See Downs v. Poulin (Me.), 216 A.2d 29 (1966), and many citations; Nahas v. Noble, supra, 77 N.M. 139, 420 P.2d 127 (1966); Rickard v. Rickard (Fla.), 203 So.2d 7 (1967).

The logic and reasoning in the Wisconsin, Minnesota, and New Hampshire opinions are somewhat persuasive, but we believe they miss the true basis and need for the doctrine and are not convinced that an unemancipated minor should be allowed to sue its parent for ordinary negligence, especially as here where the alleged negligence involves their personal relationship. Extreme cases such as Roller v. Roller, supra, 37 Wash. 242, 79 P. 788, 68 L.R.A. 893, Smith v. Smith, 81 Ind.App. 566, 142 N.E. 128, and Richardson v. State Board of Con-

trol, 98 N.J.Law 690, 121 A. 457, do cite supplementary reasons for the doctrine, and these are often the targets of the critics. We do not attempt to justify those reasons.

The concept that the family is a quasi-governmental unit and that the head of the family enjoys sort of a primitive sovereign immunity is advanced in Matarese v. Matarese, 47 R.I. 131, 131 A. 198, 42 A.L.R. 1360. It is often stated that in Roman law and in the early common law the family was regarded a unit of government. Although this may be an obsolete concept, we note that the beneficial effects of it could be found in the obvious need for proper parental control and discipline. We are often reminded that the failure to perform this function has weakened our social order today.

One of the vulnerable reasons for the doctrine attacked by the critics is that if the parent is compelled to pay damages to his child, there is the possibility that the money will return to the parent in the event of the child's death during minority. Roller v. Roller, supra; Eversley, Domestic Relations; Prosser, Law of Torts (3rd Ed.), Domestic Relations, § 116. Since this theory was not a bar to recovery in the case of property rights at common law, critics could not see why it should apply to personal torts. We, like most courts, do see a distinct difference in these actions. Dunlap v. Dunlap, supra, 84 N.H. 352, 150 A. 905, 71 A.L.R. 1055.

■ Another reason advanced may be referred to as "family exchequer." It is premised on the presumption that if a parent is compelled to pay damages to a child, it would deplete the family's resources to the detriment of the other children. See Roller v. Roller, supra. Critics say this is unsound because insurance can prevent such a drain and also justly reimburse the injured child for damages suffered. The better decisions, we think, hold the matter of insurance is irrelevant. Signs v. Signs, supra, 156 Ohio St. 566, 103 N.E.2d 743, 747.

We also find a line of cases denying suits between spouses despite the existence of a married women's statute. Koenigs v. Travis, 246 Minn. 466, 75 N.W.2d 478, denying recovery for ordinary negligence. Critics say this concept is inapplicable to the parent-child relationship since it cannot be seriously contended that the common law conception of unity and legal identity of spouses extended to the children. Prosser, supra.

Another reason given is the danger of fraud and collusion, and is usually advanced in suits brought by a child after being emancipated. Treschman v. Treschman, 28 Ind. App. 206, 61 N.E. 961. This reason may have merit. The danger of fraud and collusion today seems to center around the possession of liability insurance by the parent. Hastings v. Hastings, supra, 33 N.J. 247, 163 A.2d 147, 150. Critics say this is not too persuasive, for courts are well equipped to handle such matters, and do so in guest cases without difficulty. It appears to us that this is another reason the existence or nonexistence of insurance must be considered irrelevant in these actions. See 48 Iowa L.Rev. 748, 752.

Most of the cases cited by appellee are readily distinguishable from the case at bar. They are also cases where courts have attempted to modify the general parental immunity doctrine.

In Lusk v. Lusk, supra, 113 W.Va. 17, 166 S.E. 538, a child was injured while a passenger on a bus owned and operated by his father, who was under a contract with the board of education to transport children to and from school. Under the law of West Virginia the father was required to carry liability insurance and this appears to be the reason for allowing recovery. This was not a familial sort of relationship and, although the court acknowledged the parental immunity doctrine with general approval, it stated, " * * * a different situation arises where the parent is protected by insurance in his vocational capacity."

Similarly, in Wright v. Wright, supra, 229 N.C. 503, 50 S.E.2d 540, and Chase v. New Haven Waste Material Corp., supra, 111 Conn. 377, 150 A. 107, 68 A.L.R. 1497, the tort arose out of an employment context. Therein the courts of North Carolina and Connecticut reiterated their adherence to the rule of immunity of the parent from a tort action by his unemancipated child, but carved out an exception to the rule where the child was injured by the negligence of his father while acting within the scope of his employment or a respondeat superior exception. Although the North Carolina court allowed suit by the child, it did not allow maintenance of the suit directly against the father, but rather it was against the employer.

In Signs v. Signs, supra, the injury sustained by the child was due to the negligence of the father in his vocational capacity. In essense, the suit was brought against the partnership and the court again merely made an exception to the general rule. The court held: " * * * an unemancipated child should have as clear a right to maintain an action in tort against his parent in the latter's business or vocational capacity as such child would have to maintain an action in relation to his property rights." This is discussed further in Division V.

Borst v. Borst, supra, 41 Wash.2d 642, 251 P.2d 149, also allowed recovery, but once again as the exception, not the rule. In that case the father was a partner in a trucking firm, and a truck driven by him and owned by the partnership injured his child due to his negligence. The court held the minor child could maintain suit against his father when the latter was acting within the scope of his business or vocational authority.

Other exceptions to the parental immunity doctrine appear in various situations. See Emery v. Emery, 45 Cal.2d 421, 289 P.2d 218, which reaffirmed the family immunity doctrine in ordinary negligence cases but allowed recovery for malicious and willful tort; Cowgill v. Boock, supra,

189 Or. 282, 219 P.2d 445, and Mahnke v. Moore, 197 Md. 61, 77 A.2d 923, also willful tort cases; . Rozell v. Rozell, 281 N.Y. 106, 22 N.E.2d 254, 123 A.L.R. 1015, which allowed a minor child to recover from his minor sister for tortious injuries; Foy v. Foy Elec. Co., 231 N.C. 161, 56 S.E.2d 418, which allowed a suit by unemancipated child against a corporation in which his parents owned half the stock.

■ After extensive review of case law and authorities in this area, it is our conclusion that generally, in absence of statute, an unemancipated minor child may not maintain suit against its parent for injuries caused to the child by the ordinary negligence of the parent. Rickard v. Rickard, supra; Brown v. Parker (Mo. App.), 375 S.W.2d 594 (1964); Nehas v. Noble, supra; Hastings v. Hastings, supra; Bricault v. Deveau, 21 Conn.Sup. 486, 157 A.2d 604 (1960); Downs v. Poulin, supra; Pullen v. Novak, supra, 169 Neb. 211, 99 N.W.2d 16 (1959); Perkins v. Robertson, 140 Cal.App.2d 536, 295 P.2d 972 (1956); Aboussie v. Aboussie (Tex.Civ.App.), supra, 270 S.W.2d 636 (1954); Luster v. Luster, 299 Mass. 480, 13 N.E.2d 438; Oliveria v. Oliveria, 305 Mass. 297, 298, 25 N.E.2d 766; Norfolk Southern Railroad Co. v. Gretakis, 162 Va. 597, 174 S.E. 841; Matarese v. Matarese, supra, 47 R.I. 131, 131 A. 198, 42 A.L.R. 1360; Castellucci v. Castellucci, 188 A.2d 467 (R.I.); Sorrentino v. Sorrentino, 248 N.Y. 626, 162 N.E. 551; Cannon v. Cannon, supra, 287 N.Y. 425, 40 N.E.2d 236; Reingold v. Reingold, 115 N.J.L. 532, 181 A. 153; McKelvey v. McKelvey, supra, 111 Tenn. 388, 77 S.W. 664, 64 L.R.A. 991; Ball v. Ball, 73 Wyo. 29, 269 P.2d 302; Villaret v. Villaret, 83 U.S.App.D.C. 311, 169 F.2d 677; Schneider v. Schneider, 160 Md. 18, 152 A. 498, 72 A.L.R. 449; Roller v. Roller, supra; Smith v. Smith, supra; Turner v. Carter, 169 Tenn. 553, 89 S.W.2d 751; Smith v. Henson, 214 Tenn. 541, 381 S.W. 2d 892; Badigan v. Badigan, 9 N.Y.2d 472, 215 N.Y.S.2d 35, 174 N.E.2d 718; Small v. Morrison, supra, 185 N.C. 577, 118 S.E.

12, 31 A.L.R. 1135; Mesite v. Kirch-stein, 109 Conn. 77, 145 A. 753; Traczyk v. Connecticut Company et al., 24 Conn. Sup. 382, 190 A.2d 922; Shaker v. Shaker, 129 Conn. 518, 29 A.2d 765; Kelly v. Kelly, 158 S.C. 517, 155 S.E. 888; Maxey v. Sauls, 242 S.C. 247, 130 S.E.2d 570; Brumfield v. Brumfield, 194 Va. 577, 74 S.E.2d 170; Redding v. Redding, 235 N.C. 638, 70 S.E.2d 676; Ownby v. Kleyhammer, 194 Tenn. 109, 250 S.W.2d 37; Baker v. Baker, 364 Mo. 453, 263 S.W.2d 29; Smith v. Smith, 205 Or. 286, 287 P.2d 572; Tucker v. Tucker, 395 P.2d 67 (Okl.); Chaffin v. Chaffin, 239 Or. 374, 397 P.2d 771; Trundell v. Leatherby, supra; 39 Am.Jur., § 90, Parent and Child, footnote 13; Cowgill v. Boock, supra; 67 C.J.S. Parent and Child § 61b(2), p. 787.

V. Finally, appellee contends the immunity doctrine should not extend to the business or vocational establishment of the father, and cites and relies upon Dunlap v. Dunlap, supra, 84 N.H. 352, 150 A. 905, 71 A.L.R. 1055, Signs v. Signs, supra, 156 Ohio St. 566, 103 N.E.2d 743, Borst v. Borst, supra, 41 Wash.2d 642, 251 P.2d 149, Lusk v. Lusk, supra, 113 W.Va. 17, 166 S.E. 538. In the Dunlap case it was held that action was maintainable where the master and servant relation was alleged and assumed, because the parent intended that relationship change by taking out insurance to permit his child to sue for injuries received in the employment through negligence of the parent as employer. In the Lusk case the relationship assumed was that of a school bus driver and student for which insurance was carried as required under contract with the school board. The Signs and Borst cases seem to sustain the appellee's position, holding flatly that the unemancipated child should have the right to maintain an action for tort against his parent in the latter's business or vocational capacity.

These cases were carefully considered by the Texas court in Aboussie v. Aboussie, supra, Tex.Civ.App., 270 S.W.2d 636, at 638 (1966), and it was the opinion of that court that the Signs and Borst cases represented the minority rule. In the Aboussie case the child of one of the partners operating a store injured her hand in an electric fan placed on the floor by one of the partners. The court reasoned, because of her father's liability as a partner, the unemancipated child was suing her father individually for damages based upon ordinary, unintentional negligence, and upheld the defendant's motion for judgment based on the family immunity doctrine. In acknowledging the general rule applicable, the court said: "The relationship of parent and child precludes the maintenance of an action by the child against the parent for a personal tort. This rule is founded upon a sound public policy— upon the interest that society has in preserving harmony in the domestic relations." See 31 Tex.Jur. 1281, § 6, supra.

After a review of several cases from other jurisdictions, the Texas court concluded "that the peace and tranquility of the home and the best interest of minor children will be subserved by following the general rule," and under the facts of that case rejected the appellant's contention that she was entitled to bring suit in the nature of a business-customer relationship. In other words, the court found no change in the parent-child relationship sufficient to permit the child to sue the father. We agree.

Unless we are to restrict the family immunity doctrine to parent and child relationship in the home, a modification of the doctrine which seems untenable and for which no authority is cited and none discovered in our search, we must predicate the change in relationship on a more sound basis than the place where the tort is committed. Since we recognize and adopt the family immunity doctrine, we prefer to place it on the parent and child relationship as it exists when the tort occurs, whether it be in the home, in the family vehicle, on a hunting or

fishing trip, or at the father's shop. See Borst v. Borst, supra, 41 Wash.2d 642, 251 P.2d 149, 152, and citations. We are not required here to pass on the situation where the child becomes a passenger on a public conveyance his father operates. Authorities differ as to whether under those circumstances a child can maintain an action against the father for negligent operation of the vehicle. Borst v. Borst, supra, and citations. Some courts seem to predicate the right to sue upon an evident change of relationship from parent and child to driver and passenger or proprietor and customer. The distinction appears to be in the capacity in which the parent acts in directing the child.

■ Here, the injury occurred at the parents' cafe where the father had often taken his small son while he performed some task at the establishment. There is no contention the son was an employee or had come to the cafe by himself. He was under the care and direction of his father at all times material to this action, and at no time could it be said the relationship of parent and child had changed to some other recognized relationship. Theirs was personal in nature. It is not alleged that this relationship had changed in any way from that existing in the home.

Having recognized and adopted the family immunity doctrine in Iowa, we are satisfied it should not be restricted to the parent and child relationship in the home, but must extend to other places where that personal relationship exists and is maintained, such as that which appears in the case at bar.

The defendant's motion to dismiss plaintiff's petition should have been sustained. The ruling is reversed and the cause remanded for order in compliance with this opinion.

Reversed and remanded.

GARFIELD, C. J., and SNELL, MOORE, STUART, RAWLINGS and LeGRAND, JJ., concur.

BECKER and MASON, JJ., dissent.

BECKER, Justice (dissenting).

I dissent. I would adopt the rule recently adopted by the Wisconsin Supreme Court in Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193: "After a careful review of the arguments for and against the parental-immunity rule in negligence cases, we are of the opinion that it ought to be abrogated except in these two situations: (1) where the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care. Accordingly the rule is abolished in personal injury actions subject to these noted exceptions." Balts v. Balts, 273 Minn. 419, 142 N.W.2d 66 and Hebel v. Hebel (Alaska) 435 P.2d 8 also examine all of policy considerations involved in this decision and reach a far more persuasive result than that reached by the majority here.

II. We need not overrule any prior Iowa law to reach this thoroughly acceptable rule which seems consistent with the facts of modern life. In Cody v. J. A. Dodds & Sons, 252 Iowa 1394, 110 N.W.2d 255, we took a long step in this direction. We now practically repudiate Cody v. Dodds by citing Aboussie v. Aboussie (Tex.Civ.App.) 270 S.W.2d 636 with approval. The two cases are flatly contradictory.

III. The injured child, aged six, was injured while at his father's place of business. This is one of the exceptions to the general rule most often recognized by the courts. These cases are considered and rejected at Divisions IV and V of the majority opinion. It would serve no useful purpose to extend this opinion by detailed analysis of each of those cases. But the conclusion stated by the Ohio court, Signs v. Signs, 156 Ohio St. 566,

103 N.E.2d 743 seems so reasonable that it is hard to see why it is rejected out of hand. " * * .* an unemancipated child should have as clear a right to maintain an action in tort against his parent in the latter's business or vocational capacity as such child would have to maintain an action in relation to his property rights." (emphasis added)

That is the result reached in Cody v. Dodds, supra. We should not turn this case on the fact that this is a sole proprietorship while Cody v. Dodds involved a partnership. The distinction is too artificial.

IV. We are really considering. more than one public policy. Our Iowa Constitution, Article I, section 6 notes the first policy to be considered. "All laws of a general nature shall have uniform operation;"

It is not suggested recognition of the doctrine of parental-immunity would be unconstitutional. What is suggested is the existence of a public policy which has the force of constitutional recognition.

In Frost v. Des Moines Still College, 248 Iowa 294, 79 N.W.2d 306, we put the matter in stronger language: "Justice Rutledge, in President and Directors of Georgetown College v. Hughes, 76 U.S. App.D.C. 123, 130 F.2d 810, 827, pointed out that 'the law's emphasis ordinarily is on liability, not immunity, for wrongdoing', and we may also observe that public policy abhors the classification and inference brought about by so-called 'protected negligence.' We strive to eliminate it—not foster and encourage it."

We should strive to make justice even handed. This goal would be legitimate even without constitutional sanction. When we deny a litigant access to our courts because of his status, or his relationship to his adversary, or because of the adversary's special status, to some degree we violate the spirit, if not the letter, of that ideal.

Whenever we set a class of people apart, tell them they are unlike other people and deny to them the process of the law we violate a strongly felt need for equal treatment. We immediately search for exceptions, create legal fictions and try in one way or another to do justice. We try to achieve a just result which would otherwise be summarily denied. As often as not, in the end, we abolish the special rule. Such will probably be the fate of the strong pronouncement made by the majority today.

This prediction seems reasonable in view of the demise of the doctrine of charitable immunity. Compare Mikota v. Sisters of Mercy, 1918, 183 Iowa 1378, 168 N.W. 219 with Andrews v. Y. M. C. A., 1939, 226 Iowa 374, 284 N.W. 186 and Haynes v. Presbyterian Hospital Ass'n, 1941, 241 Iowa 1269, 45 N.W.2d 151. The doctrine of governmental immunity received rough handling before it was finally laid to rest by the 61st General Assembly of the State of Iowa, Senate File 710, approved July 20, 1967. The many exceptions to the Iowa Guest Statute would indicate an effort to do justice despite "protected negligence."

I respectfully submit the history of the development of the law favors the result reached by the Minnesota and Wisconsin courts and suggest that we should not reject such development. We can recognize the realities of modern life in this first clear consideration of the subject. *Stare decisis* presents no problem now. In this day in this factual situation the need to deny this child the use of the courts is not demonstrated.

MASON, J., joins in this dissent.